UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CREATIVE PACKAGING SOLUTIONS, LLC<br><br>Plaintiff,<br><br>-against-<br><br>NAILPOLIS, INC.<br><br>Defendant. | Civil Case No.: 1:22-cv-07467<br><br><br>**COMPLAINT** |

Plaintiff Creative Packaging Solutions LLC ("CPS"), by and through its undersigned attorneys, for its Complaint against defendant Nailpolis Inc. ("Nailpolis") alleges as follows:

**Nature of the Action**

1. This is an action for breach of contract and unjust enrichment based on Nailpolis's failure to pay CPS certain fees pursuant to the Equipment Purchase Agreement (the "Purchase Agreement").

**Parties**

2. CPS is a Pennsylvania limited liability company with its principal place of business located in Lancaster, PA. All members of CPS are citizens of Pennsylvania.

3. Nailpolis is a New York corporation with its principal place of business located in Long Island City, New York.

**Jurisdiction and Venue**

4. Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

5. Venue properly lies in this Court because the parties agreed in the Purchase Agreement to submit to the exclusive jurisdiction of, and venue, in a federal or state court located in New York City for the resolution of all disputes arising out of the Purchase Agreement. Defendant's place of business in this State is located in Queens, NY.

6. The Purchase Agreement by its terms is governed by the laws of the State of Delaware. See Purchase Agreement §9

## Relevant Facts

### CPS

7. CPS is an equipment manufacturer focusing on packaging automation and robotic solutions for its clients.

### Nailpolis

8. Nailpolis is a manufacturer and distributor of nail polish and related products.

### The Purchase Agreement

9. On March 13, 2021, CPS and Nailpolis executed the Purchase Agreement, pursuant to which Nailpolis engaged CPS to provide a packaging system consisting of (1) a filling station, (2) a bottle labeler (3) a cartoning station. (4) Internal Carton back labeler (5) Offline Stand Alone Carton Back Labeler. The packaging system is referred to in the Purchase Agreement as the "Equipment".

10. Nailpolis desired for CPS to design and create a packaging system specifically tailored to its "Holotaco" brand of nailpolish and nailpolish packaging. To that end, Nailpolis stated to CPS that the Equipment would be used to fill bottles of a specific size and shape along with a brush of a definite thickness.

11. CPS designed the Equipment based on the specifications provided by Nailpolis

prior to entering into the Purchase Agreement.

12. The Purchase Agreement has a term ending six (6) months following the delivery and installation of the Equipment with additional provisions for termination for breach and order cancellation.

13. Neither CPS nor Nailpolis terminated the Purchase Agreement.

14. Neither CPS nor Nailpolis cancelled the order for the Equipment.

15. Exhibit A of the Purchase Agreement details the scope of work and pricing for the Equipment exclusive of transportation charges. The total price is $1,484,774.00 (Purchase Agreement Exhibit A).

16. Pursuant to the Purchase Agreement, all transportation charges incurred in delivering the Equipment were to be invoiced to Buyer. See Purchase Agreement § 4 (b)

17. To date, Nailpolis has paid a total of $1,100,000 for the Equipment wherein Nailplois still owes Nailpolis $384, 774.00 pursuant to the Purchase Agreement

18. To date, Nailpolis has not paid any of the transport or freight charges totaling no less than $15,408.00

**Nailpolis's Obligations Pursuant to Purchase Agreement**

19. Pursuant to § 4 (e) of the Purchase Agreement, Nailpolis was "responsible for arranging appropriate resources (including air and electrical hookups) for the installation of the Equipment."

20. Nailpolis failed to provide the requisite resources ensuring timely installation of the Equipment.

21. Nailpolis failed to provide the requisite resources and production grade samples ensuring appropriate testing of each component of the Equipment.

22. The testing of the filler, labeler and cartoner is undertaken through a Factory Acceptance Test (FAT) at various equipment manufacturers' facilities.

23. Nailpolis provided CPS with a limited number of labels, boxes, brushes, nail polish and other production grade samples prior to conducting the FAT. The purpose of providing these materials was to ensure that CPS designed and calibrated the Equipment to accommodate the production quality materials Nailpolis would be using while operating the system.

24. CPS tested the Equipment using the limited samples prior to scheduling and conducting the FAT.

25. The Equipment operated satisfactorily when tested using the limited samples.

26. Nailpolis was required to provide additional production quality materials in significant quantities at the FAT to conduct test runs of the Equipment.

27. Nailpolis was required to bring these materials to the FAT.

28. At the FAT, Nailpolis provided non-conforming materials because it did not have the production quality materials on hand in the requisite quantities.

29. Nailpolis did not inform CPS that the materials provided at the FAT were not the same materials that would be used while operating the Equipment after installation.

30. Nailpolis provided non-production quality materials at the FAT.

31. Nailpolis provided a different label at the FAT than the one they provided to CPS for quotation and design.

32. Nailpolis brought a thicker and larger brush to the FAT than the one they provided to CPS for quotation and design.

33. Nailpolis brought different cartons to the FAT than the ones they provided to CPS for quotation and design.

34. As a result, the CPS was unable to accurately test and assert proper functionality of the Equipment at the FAT.

35. At a subsequent FAT, Nailpolis again changed its specifications and required that a 55 gallon drum be used with the filler instead of the previously requested 5 gallon gravity vessel.

36. CPS incurred significant additional expense in re-designing and recalibrating the Equipment as a result of Nailpolis' refusal and inability to provide production quality materials.

37. These additional expenses were outside the scope of the Purchase Agreement.

38. These additional expenses included, but were not limited to, labor costs, freight charges, rigging charges, redesigned parts, pneumatic pumps and travel expenses.

39. These additional expenses were in the amount of no less than $63,031.84

**Nailpolis Refuses to Pay CPS**

40. CPS successfully delivered and installed the Equipment on July 1, 2022.

41. All tests were conducted and the parties agreed that the system was fully functioning and operational.

42. However, later that afternoon, Daniel Roses, of Nailpolis, sent an e-mail to CPS representatives indicating that he was unilaterally providing "conditional" approval of the Equipment and demanded additional improvements outside the scope of the specifications agreed to by the parties.

43. CPS responded by informing Nailpolis that its demands were inconsistent with the work CPS was hired to perform, and demanded that payment in full be made for the Equipment before any further change orders would be discussed.

44. Despite this, Nailpolis has refused to make payment on any monies owed to CPS for the Equipment and other charges.

45. Nailpolis has refused to pay for the additional costs and expenses incurred as a result of Nailpolis' failure to provide accurate testing materials for FATs, product details and facility information.

### COUNT I – Breach of the Purchase Agreement

46. CPS repeats and realleges as though fully set forth herein the allegations of Paragraphs 1 through 45 of the Complaint.

47. The Purchase Agreement is an enforceable agreement that imposes certain contractual obligations upon Nailpolis.

48. CPS fully performed its obligations under the Purchase Agreement.

49. Nailpolis breached the Purchase Agreement by, among other things, failing to pay CPS the balance due for the manufacture, delivery and installation of the Equipment

50. Nailpolis breached the Purchase Agreement by not providing the resources necessary to ensure timely completion and testing of the Equipment.

51. As a direct and proximate result of Nailpolis's breaches, CPS suffered damages in an amount not less than $384, 774.00 plus at least $15,408.00 in transportation charges

52. Pursuant to § 11 of the Purchase Agreement, the prevailing party is entitled to recover its reasonable attorney's fees and costs from the other Party.

### COUNT II – Unjust Enrichment

53. CPS repeats and realleges as though fully set forth herein the allegations of Paragraphs 1 through 52 of the Complaint.

54. Nailpolis was enriched by receiving the Equipment from CPS, which required significant additional expense beyond the scope of the Purchase Agreement.

55. CPS was impoverished as it incurred significant additional expense (outside the

scope of the Purchase Agreement) in re-designing and recalibrating the Equipment as a result of Nailpolis' refusal and inability to provide production quality materials.

56. Accordingly, CPS' incurring additional expense in redesigning and recalibrating the Equipment was directly related to Nailpolis accepting, and using, the Equipment.

57. There is no justification for Nailpolis not compensating for the additional expense of completing the Equipment.

58. There is no remedy at law for CPS to otherwise recover the cost of the additional expenses from Nailpolis.

59. As a result, CPS is entitled to damages in the amount of $63,031.84.

## **Prayer for Relief**

WHEREFORE, plaintiff demands judgment against defendant as follows:

    A.    Awarding CPS damages against Nailpolis in an amount not less than

1. $384,774.00 pursuant to the Purchase Agreement;

2. $15,408.00 in transportation charges pursuant to the Purchase Agreement

3. $63,031.84 in additional expenses

    B.    Awarding CPS attorneys' fees, costs, and disbursements incurred as a result of this action; and

    C.    Awarding CPS such further relief as the Court deems just and proper.

Dated:  December 8, 2022
         New York, NY

JONES, WOLF & KAPASI, LLC

*/s/ Anand A. Kapasi*
Anand A. Kapasi, Esq.
60 East 42nd Street, 46 FL
New York, New York 10165
(646) 459-7971 telephone
(646) 459-7973 facsimile
akapasi@legaljones.com
*Attorneys for Plaintiff*